# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DARIUS O. HARDEN, | § | |
| | § | No. 290, 2017 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | I.D. No. 1305019629 |
| STATE OF DELAWARE, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: January 24, 2018
Decided: February 6, 2018

Before **STRINE**, Chief Justice; **SEITZ** and **TRAYNOR**, Justices.

Upon appeal from the Superior Court. **REVERSED** and **REMANDED**.

Christopher S. Koyste, Esquire, Law Office of Christopher S. Koyste, LLC, Wilmington, Delaware, *Attorney for Appellant, Darius O. Harden.*

Martin B. O'Connor, Deputy Attorney General, Department of Justice, Wilmington, Delaware, *Attorney for Appellee, State of Delaware.*

**STRINE**, Chief Justice:

# I.

This petition for post-conviction relief argues that defendant Darius Harden suffered prejudice because his attorney did not represent him effectively at his sentencing hearing. Sentencing was a critical stage for Harden because he committed an awful crime of violence, and did so in front of the victim's five-year-old child. As originally charged, Harden faced potential convictions for Home Invasion, Assault Second Degree, Terroristic Threatening, Theft, Offensive Touching, and Endangering the Welfare of a Child. Eventually, he pled guilty to Assault Second Degree and Endangering the Welfare of a Child, and the State agreed to cap its sentencing recommendation to 15 years.

This agreement was important because Harden, due to his habitual offender status, faced a potential maximum sentence of life imprisonment for the crimes to which he pled guilty. This was not Harden's first act of violence, and there were plenty of good reasons why a sentencing judge could have given Harden a longer sentence than the 15 years the State agreed to recommend. Even worse, after he committed the crime, Harden blamed the assault on the victim, claiming it was in self-defense, and also attempted to threaten the victim into recanting her story.

Before his sentencing hearing, Harden's trial counsel from the Public Defender's Office changed jobs. Rather than seek a continuance to prepare for sentencing with Harden and develop a sound strategy, Harden's new sentencing

counsel proceeded to the sentencing hearing after, at best, a fleeting discussion with Harden on the day of the hearing either in lock-up or in the courtroom itself. Sentencing counsel did not prepare Harden for allocution or make any effort to discuss with him whether there was mitigating evidence that might support a more lenient sentence. Instead, Harden's new counsel acted on the supposed strategy of seeking less than the 15 years that the State agreed not to exceed in its recommendation. That this strategy was not a strategy in the sense of involving any overarching plan to achieve the intended objective showed in counsel's brief argument that the court should give Harden three years less than the State's recommendation of 15 years, without articulating any plausible reason why that was so.[1]

Counsel then let Harden speak. Although Harden attempted to explain that he was sorry for his gruesome crime, he started off by indicating that he had experienced a "difficult" year and had "lost a lot" as a result of his conviction.[2] After listening to Harden, the Superior Court judge sentenced him to 18 years at Level V supervision: three years more than the State sought. In that decision, the judge specifically cited to Harden's allocution and his focus on himself, rather than on the effect of his crime on his victims.

---

[1] Sentencing Tr. 12:8.
[2] *Id.* at 12:18.

Harden did not appeal his conviction. After his *pro se* motion for a sentence reduction was denied, Harden brought a Rule 61 petition alleging that his counsel's performance in the sentencing phase was ineffective and prejudiced him.[3] In addressing Harden's petition, the Superior Court assumed that Harden's counsel had performed unreasonably under *Strickland*, but held that there was no prejudice because the record supporting a sentence of 18 years was so strong.

We agree with the proposition that the objective facts would support a sentence of 18 years for Harden as a proper exercise of judicial discretion. But that does not answer the inquiry under *Strickland*. The question under *Strickland* is whether there is a reasonable probability that the outcome at sentencing would have been different if counsel had acted with reasonable diligence and skill. In a case where the whole point of the defense is to use a plea to get the best sentence, it is critical that counsel undertake reasonable efforts to prepare for sentencing, consider whether there is mitigating evidence (and if so, develop it), and make a rational determination about how to approach the sentencing hearing. In this case, for example, it was important to decide whether to argue against the 15 years that the State agreed to recommend, recognizing the hazards of that approach, or to argue that Harden was sorry, recognized that what he did was terribly wrong, and accepted the State's recommendation and simply would ask the court to enter a sentence at

---

[3] Appellant's Opening Br. 2.

that level.  Instead, without any reasonable investigation or basis to do so, counsel argued that the court should give three years less than the State recommended, and then had Harden give an unprepared allocution statement.

Even more than preparing a witness to testify—a process that also helps determine *whether* a witness should testify, if not testifying is an option—preparing a defendant who has pled guilty for allocution is a duty of fundamental importance. The impression a defendant makes on a sentencing judge is critical, especially in a case where the crime is serious and the defendant tried to interfere with the victim's testimony earlier in the proceedings.  All witnesses face nerves, even experienced corporate executives.  So too do criminal defendants.  The right to representation includes having a lawyer who makes a reasonable effort to prepare you for allocution, decides if you can do so effectively, and helps you put your best foot forward if you decide you wish to speak.  Harden got no help of that kind, and his awkward, spontaneous presentation—despite including statements of contrition— started with references to the effect of the crime on himself.  Harden's self-centered commentary was specifically referenced in the judge's sentencing decision as the "most troubling aspect" of the case, and was an indicator of at least one of the four aggravating factors cited in the sentencing order: lack of remorse.[4]

---

[4] Sentencing Tr. 15:7; Sentence Order (May 30, 2014), at 5.

4

Given the objective reality that Harden's unprepared allocution aggravated his sentence and the undisputed fact that counsel developed no rational strategy for arguing for a shorter sentence than the State sought, there is a reasonable probability that had counsel acted reasonably, Harden could have received a sentence in accord with the State's recommendation of 15 years, rather than the 18 years he got. In so determining, we do not fault the trial judge in any way. Rather, we only acknowledge the importance of the sentencing hearing in making difficult sentencing decisions in cases like these and the reality that how a defendant presents himself is a rational factor in determining the ultimate sentence. When a defendant's counsel fails to prepare himself or his client, and the sentencing decision itself reflects the negative effects of that failure, prejudice under *Strickland* exists. For these reasons, we reverse and remand for resentencing before a different judge.

## II.

To understand the key questions in this case, it is critical to understand the seriousness of Harden's crime and the other factors aggravating toward harsh punishment for it. Harden assaulted his girlfriend, Ms. Ellison, kicking and punching her repeatedly, and eventually waking up her five-year-old son, who "came downstairs to see his mother being kicked and punched in the face numerous times while she lay on the ground."[5] "After the beating ceased, [Harden] ripped

---

[5] *State v. Harden*, Nos. 1305019629 and 1312003017, at 1 (Del. Super. June 19, 2017).

[Ms. Ellison's] phone and cash from her breast pocket," and "threatened her not to call the police or he would kill her."[6] As a result of the assault, Ms. Ellison received "injuries to her face, stomach, and ribs; including a nasal fracture and two [lost] teeth."[7]

Days later, Harden visited a hospital under an alias to seek treatment for "an infection and wound on his right hand."[8] Harden explained the injury as resulting from him closing his car door on his hand, but medical staff did not believe him—"presumably because of the human teeth marks visible on his hand—and contacted police."[9] When the police arrived, Harden changed his story, stating instead that Ms. Ellison bit his right hand "like a puppy" in order to prevent him from leaving the house the night of the assault.[10] In turn, "he struck her three or four times in the face—as if he was acting in self-defense."[11]

Harden was indicted on charges of Home Invasion, Assault Second Degree, Terroristic Threatening, Theft, Offensive Touching, and Endangering the Welfare of a Child on July 8, 2013. While these charges were pending, Harden tried to convince Ms. Ellison to lie about that evening's events in an effort to "minimize"

---

[6] *Id.* at 2.
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.* (internal citations omitted).

Harden's assault.[12]  "As a result, [Harden] was indicted for charges of Tampering with a Witness and Act of Intimidation."[13]

Harden's case went to a jury trial on February 18, 2014.[14]  But, because of a prejudicial comment made during Ms. Ellison's testimony, that trial was declared a mistrial.[15]  "After the aborted trial and before [Harden] was retried, [Harden] contacted [Ms. Ellison] to again attempt to influence her testimony regarding the incident.  This correspondence was handed over to the State and Defense counsel."[16]

On March 10, 2014, Harden pled guilty to Assault Second Degree and Endangering the Welfare of a Child.  "As part of the negotiations to reach [the plea] agreement, the State [sought] to declare [Harden] a habitual offender before sentencing," and its request was granted.[17]  In return, "the State agreed to cap its recommendation for Level V supervision at 15 years."[18]  Because of his status as a habitual offender, Harden faced a minimum sentence of eight years and a maximum sentence of life imprisonment.

---

[12] *Id.* at 3.
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] State's Answering Br. 6.
[18] *Id.*

## III.

On May 16, 2014—a little over two months after Harden's guilty plea was entered—Harden's trial counsel, who was a Public Defender, took a new job and "ceased active representation of clients."[19] By May 28th, new sentencing counsel had been assigned to the case by the Public Defender's Office, but the prosecutor had still "not been informed of [who would] be handling the sentencing."[20]

Harden's sentencing counsel's first affidavit, filed in response to Harden's original, *pro se* petition for post-conviction relief, states in a single paragraph that he discussed with Harden his "intent to adopt prior counsel's position and argue for the sentencing cap" before the sentencing hearing and that Harden "affirmatively acknowledged his acceptance of [sentencing counsel's] representation and litigation goal to argue for the sentencing cap outlined in the plea agreement."[21]

Harden's amended petition for post-conviction relief, which was filed after he requested and received Rule 61 counsel, asked sentencing counsel specific questions. Harden's sentencing counsel's supplemental affidavit responding to those questions includes the original paragraph from his first affidavit, suggesting that his intent was to accept the State's recommendation, but adds three words to the description of his litigation goal, stating that Harden acknowledged his litigation

---

[19] Trial Counsel's Affidavit (Aug. 5, 2015), ¶ 1–2.
[20] Email from Zoe Plerhoples to Judge Medinilla (May 28, 2014).
[21] Sentencing Counsel's Affidavit (Aug. 13, 2015), ¶ 1.

8

goal to argue "for *no more than*" the sentencing cap.[22]  And counsel's supplemental affidavit also states that his strategy at Harden's sentencing hearing was to "request that the Court consider less (12 years Level V) contrary to the sentencing cap [of 15 years]."[23]  That is, contrary to his first affidavit, which suggests that counsel was going to argue for the 15 years the State accepted as a cap on its recommendation, counsel's second affidavit suggests that he was going to seek 20% less than the agreed upon cap.

Counsel's supplemental affidavit provides additional details about his representation, stating that he received the case file "at best 2-3 days" before Harden's sentencing hearing took place on May 30th.[24]  Counsel's affidavit also states that he met with Harden for the first time for 15 to 20 minutes in "lock-up" before the sentencing hearing began.[25]  But the sentencing hearing transcript suggests a slightly different reality, which is that sentencing counsel spoke to Harden for the first time right before Harden's sentencing hearing started, when counsel requested and received permission from the court to speak with Harden.[26]

---

[22] Sentencing Counsel's Supplemental Affidavit (Aug. 17, 2016), ¶ 1 (emphasis added).
[23] *Id.* at ¶ 2(1).
[24] *Id.* at ¶ 2(3).
[25] *Id.* at ¶ 2(4).
[26] Sentencing Tr. 3:2–10 ("[Sentencing Counsel]:  I was reassigned from [trial counsel].  If I can have a moment when Mr. Harden comes out. . . . (Discussion held off the record.)  [Sentencing Counsel]:  We are ready to proceed.").

During Harden's sentencing hearing, the State spoke first, and advocated for a 15-year sentence, in accordance with its plea agreement with Harden. The State discussed Harden's lack of remorse in its presentation:

> [Harden] refuses to accept responsibility for his actions. He blames the victim. He says that she provoked him. He says that she attacked him first, which is not consistent with the physical evidence in the case nor consistent with the version of the facts given to me by either the State's witnesses or Ms. Ellison. I'm not saying there wasn't an argument. We don't know, we were not there, but certainly to say that he was [not] the physical instigator of this is very specious.[27]

Harden's counsel then made his presentation and did not stick to asking the court to accept the sentencing cap agreed to by the State. Instead, counsel sought to have Harden receive less than the cap, and suggested that "12 years, give or take, as opposed to 15 is a good starting point."[28] This was a 20% reduction from the State's agreed recommendation. In making this argument, counsel discussed Harden's choice to plead and cooperation on unrelated matters as mitigating his criminal history and the violent nature of the assault:

> Thankfully, with clearly a history of bad decision making, wrong choices, perhaps finally [Harden] ma[d]e a correct choice in pleading . . . . I think Mr. Harden understands that you simply cannot hit someone hard enough to knock their teeth out and cause injury. That is what happened in this case. . . .
>
> [H]e is eight years minimum right out of the gate, which is a significant punishment. . . . For my part, I can only bring a few points to the Court's attention, *perhaps something slightly less than [the State's*

---

[27] *Id.* at 7:13–22.
[28] *Id.* at 12:7–9.

*recommendation of 15 years] would be appropriate*, because at the end of the day even Mr. Harden understands he has to get a significant punishment off of what happened here. . . . He made a good [choice] by pleading. This is not a defensible case. He also made a good choice by cooperating with the State in collateral matters. The difficulty there is it has not come to fruition yet . . . . So it is premature to say he should get the benefit right now of that cooperation . . . .

I think it is one of few positive[s] that he cooperated with the State, as he should. It is a good choice. Good choices do not outweigh bad choices but it is a start.[29]

After Harden's counsel concluded his presentation, Harden spoke and said this during his allocution:

*[B]een a year for me right here difficult, lost a lot this year, not just my freedom, also Ms. Ellison, difficult, man. I can't explain how I feel right now, crazy, like, modify life right here. I can sit here and sugar coat what happened that night, I can't at the end of the day, made a decision I shouldn't have did, shouldn't have put my hand on her.* Regardless of what happened, I should have been man enough to walk away. *At the end of the day is all I can say [is] I apologize.* I mean, I know I am not allowed to speak to her. I know she is back there listening. At the end of the day all I can say is sorry. I'm not holding any kind of grudges, over and done with. Still love her. So, you know, supposed to get married [and] all type of stuff. Here I am.[30]

The sentencing judge then issued her decision, emphasizing Harden's lack of remorse:

I think to add insult to injury, my understanding [is] that you actually turned up at a medical center in Pennsylvania to see if you could press charges against her for biting you. I recognize you do not deny hitting her, but to claim even during your interview, nobody ever asked her what provoked me. She attacked me first. What was I supposed to do?

---

[29] *Id.* at 9–12 (emphasis added).
[30] *Id.* at 12:17–23, 13:1–8 (emphasis added).

11

I was protecting myself. Pictures don't show that. Medical evidence certainly does not show that. . . . Obviously and lack of remorse, to the extent you had any contact with this victim, I do not blame her, it was, again, you trying to control her, and try[ing] to play the system in order to try to escape the punishment.[31]

The sentencing judge also discussed Harden's criminal history at length:

Factors that I am also considering in this is your prior history of violence. It is extremely concerning to have seven felony convictions that include Rape Fourth, six convictions for failing to register as a sex offender, 19 violations of probation. 2003, my understanding [is] you were convicted of carrying a concealed deadly weapon, for threatening, being one of a group who threatened and robbed two victims at gunpoint.

2004, convicted for forcibly raping a 13-year-old girl. You have a history of domestic violence-related charges, and convictions including a threat in 2006, to shoot an ex-girlfriend, and arrests and other domestic-related charges in 2009, 2010, and 2011. . . .

Looks like your criminal history began at age 11 with other sexual[ly] violent crimes, at least an adjudication. At that age, I see also [a July 2012] charge [for] strangulation, unlawful imprisonment second degree against a pregnant woman.[32]

But the sentencing judge noted that Harden's allocution was the "most troubling aspect" of the case:

*To tell me this has been a terrible year for you, first thing you tell me, first thing I should hear before I impose sentence is **the most troubling aspect** because it continues to tell me that you are worrying about what this has done to you, the impact this has had on you. You never once mentioned what you—the violence has been that you have inflicted on Ms. Ellison, and [her] child.*[33]

---

[31] *Id.* at 14:5–13, 15:17–20.
[32] *Id.* at 14:13–23, 15:1–4, 15:21–23, 16:1–2.
[33] *Id.* at 15:5–12 (emphasis added).

12

The Superior Court then sentenced Harden to 18 years at Level V supervision, three years more than the prosecution sought.[34]

## IV.

Harden's Rule 61 petition argued that his sentencing counsel's ineffective and prejudicial representation caused him to "receiv[e] a three-year upward departure from the agreed-upon plea agreement between himself and the State."[35]  The Superior Court referred the petitioner's case to a Superior Court Commissioner who recommended Harden's petition be denied.[36]  The same judge who presided over Harden's sentencing hearing heard Harden's objections to the Commissioner's recommendation and issued a thorough decision explaining why she agreed that his petition should be dismissed.  The Superior Court judge explained that:

> [I]t rings hollow when Defendant argues that Sentencing Counsel's comments tainted his opportunity to express remorse; Defendant was free to express remorse notwithstanding Sentencing Counsel's comments, but, instead, Defendant chose to reiterate his tired claims that he acted in self-defense when repeatedly beating the victim, stealing her possessions, and threatening to kill her if she reported the incident to the police.[37]

The judge also noted that three of the four aggravating factors for Harden's sentence, vulnerability of the victim, need for correctional treatment, and undue depreciation

---

[34] *Id.* at 16:14–15.
[35] *Harden*, Nos. 1305019629 and 1312003017, at 1.
[36] *State v. Harden*, 2017 WL 698506 (Del. Super. Feb. 21, 2017).
[37] *Harden*, Nos. 1305019629 and 1312003017, at 16 (internal citations omitted).

of the offense, "bore no connection to [Harden's] opportunity to allocute regarding his remorse at sentencing."[38]  Even assuming that counsel's representation was deficient under *Strickland*, the judge found that Harden's claims failed to establish prejudice because the presentence investigation left her already "well aware and amply prepared to impose what [she] considered an appropriate sentence in this case."[39]

On appeal, Harden argues that, "as a result of meeting sentencing counsel for the first time mere moments before sentencing, counsel failed to discuss with [Harden] what the objectives of the sentencing hearing were and the means by which his objectives were to be accomplished" and, more specifically, "failed to alert [Harden] to the dangers of making prejudicial statements during allocution."[40] Harden further argues that: (1) because of a lack of guidance from counsel, his allocution demonstrated a lack of remorse and had a "particularly detrimental effect on the Superior Court's sentencing decision,"[41] and (2) his counsel's presentation at the sentencing hearing, which repeatedly mentioned Harden's history of making bad choices, was "prejudicial" and "undermined" the mitigation of his sentence.[42]

---

[38] *Id.*
[39] *Id.* at 12.
[40] Appellant's Opening Br. 16 (internal citations omitted).
[41] *Id.* at 21.
[42] *Id.* at 28.

There is no question that there is plenty of evidence in the record to justify an 18-year sentence. But the question under *Strickland* is not whether Harden's sentence is of a reasonable length in comparison to his offense. Instead, *Strickland* requires that a court assess whether "counsel's representation fell below an objective standard of reasonableness," and whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[43] And a reasonable probability is the probability sufficient to "swa[y] a reasonable sentencing judge to decide [Harden's] sentence differently."[44]

## A.

Harden, his sentencing counsel, and the State all agree that sentencing counsel met with Harden for the first time and only briefly on the day of his sentencing hearing. And Harden's counsel does not state in either of his sworn affidavits that he discussed with Harden the importance of being apologetic, and only apologetic, if he was going to speak in allocution and, as important, expressing sincere contrition for the harm he caused, not just to Ms. Ellison, but also to the child who witnessed his attack. If Harden was unapologetic, then sentencing counsel should have encouraged him not to speak at allocution. Even further, if Harden did not tell sentencing counsel he was sorry for his actions, his lawyer could not have expressed

---

[43] *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).
[44] *Taylor v. State*, 32 A.3d 374, 386 (Del. 2011).

15

contrition on his behalf to the court, as that would have been misleading. But, having the discussion about Harden's contrition was critical, because absent contrition there was no plausible basis to seek less than 15 years. Indeed, in this case, without counsel understanding that Harden wished to accept responsibility for his wrongful acts and apologize, sentencing counsel's stated strategy lacked any rational basis.

The substantial changes between sentencing counsel's affidavits underscore this point: the first describes counsel's litigation goal as arguing "for" the 15 years, and the second describes his goal as arguing "for no more than" the 15 years and requesting a 12-year sentence instead.[45] Counsel's affidavits remain confusing because the second affidavit also continues to say that counsel told Harden he "inten[ded] to adopt prior counsel's position and argue for the sentencing cap," not to seek to get substantially less than that amount.[46]

But, there is a critical consistency in the affidavits. Absent from both affidavits is any discussion of how Harden's allocution would help achieve counsel's objectives. Nor do the affidavits address whether counsel discussed the relative wisdom of Harden not speaking but instead expressing contrition, remorse, and acceptance of responsibility through counsel.

---

[45] Sentencing Counsel's Affidavit (Aug. 13, 2015), ¶ 1; Sentencing Counsel's Supplemental Affidavit (Aug. 17, 2016), ¶ 1, 2(1).
[46] Sentencing Counsel's Supplemental Affidavit (Aug. 17, 2016), ¶ 1.

16

Consistent with these omissions, counsel's affidavits also neglect to discuss *how* he would pursue his strategy of getting Harden the minimum sentence proposed by the State, or *why* he thought it was a good tactical decision to request a 12-year sentence instead of agreeing to the State's 15-year recommendation. And, by his own admission, Harden's counsel spent no longer than 20 minutes with Harden—a length of time too short to address these critical strategic decisions.

As the Supreme Court of the United States has recognized, "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what [constitutes] reasonable [representation]."[47] And the ABA Standards for Criminal Justice advise that sentencing counsel should: (1) "be fully informed regarding available sentencing alternatives"; (2) consider and explain the consequences of the various dispositions available to the accused; (3) "alert the accused to the right of allocution"; and (4) "consider with the client the potential benefits of the judge hearing a personal statement from the defendan[t] as contrasted with the possible dangers of making a statement that could adversely impact the sentencing judge's decision or the merits of an appeal."[48] As the National Legal Aid and Defender Association's Performance Guidelines state:

---

[47] *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010) (collecting cases) (quoting *Strickland*, 466 U.S. at 688).

[48] ABA STANDARDS FOR CRIMINAL JUSTICE: THE DEFENSE FUNCTION, Standard 4-8.3(a), (b), (f) (4th ed. 2015).

In preparing for sentencing, counsel should consider the need to . . . maintain regular contact with the client prior to the sentencing hearing, and inform the client of the steps being taken in preparation for sentencing[,] . . . obtain from the client relevant information concerning such subjects as his or her background and personal history, prior criminal record [etc., and] . . . inform the client of his or her right to speak at the sentencing proceeding and assist the client in preparing the statement, if any, to be made to the court.[49]

Through communication with the client, sentencing counsel must then develop a sentencing strategy: "Just as a theory of defense is essential to a trial, so too is a theory of sentencing essential to the sentencing phase. Further, the sentencing theory needs to be supported and promoted as forcefully as the theory of defense would be at trial, mandating investigation, preparation, and presentation."[50]

After being assigned to Harden's case "2-3 days prior to sentencing,"[51] counsel should have found time to discuss with Harden the importance of allocution and possible mitigating factors, or requested a postponement in order to do so. To decide whether and how Harden would allocute, and whether to match the State's 15-year sentence recommendation, Harden's counsel needed to communicate with his client and investigate Harden's strategic options.

For example, Harden's counsel should have asked Harden what he would say during allocution, listened to Harden's response, and made an informed decision

---

[49] NAT'L LEGAL AID AND DEF. ASS'N., PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION § 8.3 (2006).

[50] 3 CRIM. PRAC. MANUAL § 104:6 (West 2017) (citing ABA STANDARDS FOR CRIMINAL JUSTICE: THE DEFENSE FUNCTION, Standard 4-8.1 (3d ed. 1993)).

[51] Sentencing Counsel's Supplemental Affidavit (Aug. 17, 2016), ¶ 2(3).

about whether or not it was in Harden's best interest to speak at the hearing at all.[52]

Here, the record suggests that Harden wished to say he was sorry, as he attempted to do during his allocution, but he was unable to do so in a way that the trial judge deemed genuinely remorseful. But if, after meeting with Harden, it was determined that he could not express contrition in a sufficiently clear and convincing way, and that there was no rational basis for arguing for less than 15 years, counsel might well have concluded with Harden to argue to the court that Harden was sorry and was willing to accept the punishment the State recommended by saying something like this:

> Mr. Harden wishes for me to accept the sentence the State recommended, and to convey on his behalf his sincere apologies to the victim and her child for the horrible crime he committed and for trying to avoid responsibility for it. Because he accepts responsibility and understands that his prior record is unacceptable, he agrees with the State's recommendation of 15 years, and would ask the court to enter a sentence at that level. He wanted me to say to the court that he recognizes that what he did was wrong, and even worse, that it was done in the presence of a child. He asked me to say that he is deeply sorry for what he did to the victims, and the best way he can express that is to accept the sentence the State recommends.

---

[52] *See, e.g.*, Mark W. Bennett & Ira P. Robbins, *Last Words: A Survey and Analysis of Federal Judges' Views on Allocution in Sentencing*, 65 ALA. L. REV. 735, 767 (2014) (surveying all federal district court judges and finding that "[t]he responding judges agreed that defense counsel should participate actively in allocution preparation. Some even advocated rehearsing with the defendant. Many judges suggested, for example, that defense counsel '[d]o a practice session and offer coaching in response' and 'listen to the allocution and help the defendant avoid saying things that can hurt him or her.' Many judges also suggested that defense counsel should encourage the defendant to write out a statement so the defense lawyer can preview the message.").

By this means, counsel would have positioned Harden to get the benefit of his plea bargain, and been able to call on the court's natural inclination to uphold, where it can reasonably do so, good faith agreements made between the prosecution and defense. Instead, counsel urged the court to depart downward from the position taken by the State, and to use its own judgment freely based on the record before it to determine Harden's sentence. Counsel did so without developing any reasoned presentation to support a lower sentence or preparing his client to allocute, knowing that the record facts reasonably supported a sentence higher than 15 years.

Before selecting a strategy for the sentencing hearing, Harden's counsel should have explained the risks of proposing a sentence shorter than the State's recommendation, asked Harden if there was any mitigating evidence to support a request for a shorter sentence, and discussed why, without additional mitigating evidence, in the case of a defendant with such a horrific record of violence, it might make sense to accept the State's recommendation instead. But because counsel did not meet with Harden until the day of the sentencing hearing, there was no time to investigate mitigating factors, interview possible witnesses, discuss a sentencing strategy, or prepare Harden to allocute (or decide that he should not allocute). And because Harden's counsel needed more time to have these fundamental conversations and investigate any leads that came out of them, he should have

20

requested a postponement from the sentencing judge. There was no disadvantage to

sentencing counsel simply saying the following to the judge:

> Your Honor, I have just been appointed. Mr. Harden has made an important decision to accept responsibility for his serious crime. I have an obligation to meet with him to determine how to address the sentencing proceeding, and I cannot do that in 20 minutes today, the first day I have met with him. Mr. Harden is in jail, poses no threat to the public, and I would ask for a postponement. I regret very much wasting the court's time, but circumstances beyond our control are at work.

Although a "defendant must overcome the presumption that, under the

circumstances, the challenged action 'might be considered sound trial strategy,'"[53]

uninformed decisions do not qualify as sound strategy. "[S]trategic choices made

after less than complete investigation are reasonable only to the extent that

reasonable professional judgments support the limitations on investigation."[54] And

"if counsel has failed to conduct a reasonable investigation to *prepare* for

sentencing, then he cannot possibly be said to have made a reasonable decision as to

what to *present* at sentencing."[55]

In his supplemental affidavit, sentencing counsel stated that his strategy was

to argue for "no more than" the sentencing cap and to "request that the Court

consider less (12 years Level V) contrary to the sentencing cap [of 15 years]."[56] But

---

[53] *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).
[54] *Wiggins v. Smith*, 539 U.S. 510, 512 (2003) (internal quotations omitted) (quoting in part *Strickland*, 466 U.S. at 690–91).
[55] *Blystone v. Horn*, 664 F.3d 397, 420 (3d Cir. 2011).
[56] Sentencing Counsel's Supplemental Affidavit (Aug. 17, 2016), ¶ 1, 2(1).

that is not a strategy, it is just a goal of getting Harden less time in prison. Sentencing counsel's key failure was not his goal, it was his lack of effort to test out whether that goal was feasible by taking reasonable steps to develop a strategy to achieve it. To the extent Harden's counsel made any arguments at the hearing in favor of a 12-year sentence, those were only that Harden pled guilty to the assault and Harden was serving as a witness in other unresolved cases that had yet to "come to fruition."[57] Instead of requesting a postponement so that he could investigate mitigating factors and discuss allocution with Harden before his sentencing hearing, Harden's counsel presented an uninformed defense requesting a 12-year sentence that cannot be justified as strategic.

We have no doubt that sentencing counsel subjectively did the best that he could, and we acknowledge that the heavy caseloads that too many of our defense counsel carry may impel them to push ahead without reflecting on the need for more time. We also note that this case is meaningfully distinct from a common scenario in which defense counsel proceeds immediately to sentencing after striking a plea bargain. In those situations, defense counsel has usually spent the preceding period forging an agreement with the State, with the full input of the client. The point of a plea agreement is to secure the client the most certainty he can get as to his sentence by reaching an agreement with the State about the recommended sentence, and then

_____

[57] Sentencing Tr. 11:11–16.

22

advocating to the court that it should accept the parties' good faith agreement. In that context, it is precisely because defense counsel has included the client in the bargaining process and is seeking to call on the court's natural inclination to uphold good faith plea agreements that counsel acts reasonably in proceeding right to sentencing.

Because Harden's sentencing counsel was not the one who worked with him on the plea, had never spoken to him until fleetingly before the sentencing hearing itself, and did not adhere to arguing that the court should accept the State's agreed recommendation, the circumstances here are far different and compelled sentencing counsel to take the time necessary to develop a reasoned approach to sentencing with the client's input. That did not happen.

Not even in a civil case would a lawyer approach the remedy phase by meeting his client for the first time for 20 minutes on the day of the proceedings to piece together an unprepared closing. Nor does any typical witness in even a civil deposition give testimony without extensive preparation by his lawyer, much less give testimony in court directly to the tribunal without preparation. When what is at stake is the liberty of a human being, preparation of this kind is more important, not less important, than when what is at stake is whether a witness for a corporate defendant stands up well to questioning in his deposition.

23

As is often the case with plea bargains,[58] Harden pled guilty to help secure a sentence shorter than he could potentially receive. Here, Harden could have received eight years to life. By pleading guilty to Assault Second Degree and Endangering the Welfare of a Child and getting the State to recommend a 15-year sentence, Harden ensured he would receive a sentence substantially shorter than life in prison. Counsel's strategy of arguing as new counsel without sufficient preparation or basis that a 12-year sentence was more appropriate than the State's recommendation without preparing Harden for allocution or providing mitigating evidence falls below an objective standard of reasonableness. "Judges are inclined to honor a prosecutor's recommendation on sentencing,"[59] and if Harden's counsel did not have sufficient mitigating evidence to support an argument for a 12-year sentence, he should have accepted the State's 15-year recommendation.

## B.

To determine whether Harden has shown the necessary prejudice under *Strickland*'s second prong, the question this Court must ask is whether there is a reasonable probability that, had Harden's counsel fulfilled his advisory obligations, Harden would have received a shorter sentence. By choosing to argue for a 12-year

---

[58] *See, e.g.*, *Brady v. United States*, 397 U.S. 742, 756 (1970) ("Often the decision to plead guilty is heavily influenced by . . . the apparent likelihood of securing leniency should a guilty plea be offered and accepted.").

[59] 2 CRIM. PRAC. MANUAL § 45:16 (West 2017).

sentence instead of accepting the State's recommendation without having time to investigate mitigating evidence or prepare Harden for allocution, sentencing counsel risked the judge's further review of the ample evidence in the record supporting a sentence longer than 15 years, including Harden's criminal history, the violent nature of the assault, and Harden's attempts to threaten Ms. Ellison into corroborating his self-defense story.  And, given the evidence in the record indicating Harden's refusal to take responsibility for the crime, it is unsurprising that the judge focused on Harden's self-centered allocution as the "most troubling aspect" of the case in her discussion of his sentence.[60]

The reality is that regardless of sentencing guidelines, statutory minimums, or presentencing reports, there is an inescapably human element to sentencing.  How a judge perceives the defendant's contrition, acceptance of responsibility, and self-awareness of wrongdoing is understood to be important to the sentencing decision, as those factors rationally bear on the relevant sentence.  As one judge put it, "[e]motion comes into play in every sentencing decision."[61]  And academic research shows that allocution is an important data point judges use to arrive at a final sentence.[62]  The point of having contact between the judge and the defendant is to

_____

[60] Sentencing Tr. 15:7.
[61] *See, e.g.*, Benjamin Weiser, *A Judge's Education, A Sentence At A Time*, N.Y. TIMES (Oct. 7, 2011) (quoting Judge of the United States Court of Appeals for the Second Circuit Denny Chin).
[62] *See, e.g.*, Mark W. Bennett & Ira P. Robbins, *Last Words: A Survey and Analysis of Federal Judges' Views on Allocution in Sentencing*, 65 ALA. L. REV. 735, 758 (2014) (noting that over

allow the judge to assess for himself whether the defendant's own words and demeanor support the arguments made on his behalf, or are in tension with them. For this reason, "[a] really bad allocution can earn you a longer sentence, sometimes, with an upward variance, a *much* longer sentence[.]"[63]

Even if three of Harden's sentence's four aggravating factors were unrelated to his lack of remorse, as the Superior Court judge stated in her Rule 61 opinion,[64] that does not change the fact that there is a reasonable probability that the sentencing judge's disturbance by Harden's lack of remorse influenced his sentence. There is also a reasonable probability that the Superior Court would have adopted the State's suggested sentence had Harden's counsel accepted it, and accepted responsibility for the horrible crime and profusely apologized to the victims on Harden's behalf or prepared Harden to do so in allocution unequivocally and unconditionally. Harden has therefore established prejudice.

**V.**

For these reasons, we reverse and remand to the Superior Court for resentencing before a different judge. We remand for resentencing before a new judge, but not because the original trial judge did anything wrong. To the contrary,

---

80% of federal district judges viewed allocution as either extremely, very, or somewhat important in arriving at a final sentence).

[63] Mark W. Bennett, *Heartstrings or Heartburn: A Federal Judge's Musings on Defendants' Right and Rite of Allocution*, THE CHAMPION (Nat'l Ass'n of Criminal Def. Lawyers), Mar. 2011, at 26, 27.

[64] *Harden*, 1305019629 and 1312003017, at 16.

it is clear that she was well prepared for sentencing, knew the record, and gave a reasonable sentence in light of the record before her. But, given the nature of this case and the fact that the original judge also handled Harden's Rule 61 petition, the only way to ensure that Harden's new sentence is not tainted by counsel's inadequate representation is to have a new sentencing hearing before a different judge, who will make a sentencing decision based solely on the presentations at the new hearing.